(No. 40554.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* LARRY JOE POST, Appellant.

*Opinion filed January 19, 1968.*

James D. Reynolds, of Peoria, for appellant.

Bernard L. Oltman, State's Attorney, of Pekin, (Jay H. Janssen, Assistant State's Attorney, of counsel,) for the People.

Mr. Justice House delivered the opinion of the court:

This case presents the unusual situation of a householder in the city of Pekin who fired a gun while standing in his yard, killing a fleeing intruder, and who was subsequently convicted of involuntary manslaughter by a jury in Tazewell County and sentenced to a term of 5 to 10 years in the penitentiary. The Appellate Court, Third District, affirmed (78 Ill. App. 2d 121), and we granted leave to appeal.

The defendant and his wife were in their living room watching television about 9:00 P.M. It was tuned low to avoid disturbing their small children who were asleep. They heard a car pull from 9th Street into their alley, then back out and park. Defendant walked over to his window and observed a man get out of the car, cross to the alley, crouch down behind a picket fence and hedge, and sneak along the alley. Defendant went into a bedroom, procured a .22 caliber pistol, and he and his wife went out to investigate. The wife turned and saw a man on their fence with one leg over

it and a hand on the rear of their house near the bathroom. She yelled to her husband who ran toward the prowler shouting for him to halt. The intruder jumped off the fence and ran while defendant went around his house in an attempt to stop the person at the opposite corner. As the fleeing man ran past him at the end of the alley, defendant again called to him to stop saying, "I just want to talk to you." He then heard a car door open and slam shut and a car start and flee north with a screeching of tires. Defendant had run across his front yard in an attempt to identify the car or its license. His view of 9th Street was limited to 5 or 6 feet by an adjoining house and garage. As the car flashed past by this narrow space within his view, he shot toward the ground, in his words "hoping I could scare him and he wouldn't come back and bother us any more." Defendant categorically denied pointing the gun at the fleeing intruder or intending to shoot anyone. Defendant's wife, who was called as a witness for the prosecution, corroborated his version in practically every detail. When asked if she saw him shoot, she replied that she didn't see him pull the trigger but he was holding the gun down as it fired. This evidence was practically identical with a statement voluntarily made to the police the day following the shooting.

There was no direct testimony relative to the shooting contrary to that of the defendant and his wife, unless that of a neighbor's 13-year-old boy could be so considered. He testified that because his dog was barking, he looked out and saw a man run to a car, start it and "speeded" away with tires squealing. He said that he heard a noise as the man was getting into the car. When asked to describe the sound he heard, he said: "Well, the kids were out in the street playing with caps, and it was—and there was shooting (machine gun fire) going on on the television, and it was louder and it was more sharp well, it was sharper and had more of a crack to it." It is significant that while he testified

to a sound, he could not say it was a shot and failed entirely to mention the sound to the police when interviewed the night of the shooting.

The prosecution infers from this evidence that the prowler was shot as he entered his car. If this were true he would have had to start the car, get it in gear, cross State Street immediately to the north, travel a block and then back up to State Street after perforation of the aorta which, according to the pathologist would have caused rapid and massive hemorrhage in both plural cavities and his death very rapidly.

The bullet extracted from the body, according to a report of the Federal Bureau of Investigation, could not be identified because of its mutilation. It had the appearance of being flattened at the end and about 40% sheared off lengthwise. The pathologist testified that this could have been caused either by the bullet striking a bone or by the bullet ricocheting off of something. There was no evidence of any sheared off part of the bullet present in the body and no evidence that it hit any bone structure. The point of entrance of the bullet was at the fourth interspace (below the fourth rib) and proceeded through the pleural cavity and exited through the third interspace into soft tissue, but it did not leave the body. The pathologist testified that the path of the bullet was, essentially, in a line parallel to the ground and that the elevation "would be about an inch". The prosecution argues that this testimony tends to support the theory that the prowler was shot before entering the car rather than afterward. This hypothesis has little foundation in fact because of the unsatisfactory nature of the 13-year-old boy's testimony and the total lack of distances in the record so that computation of the angle is impossible. If a bullet ricocheted from the ground in defendant's yard, across the sidewalk and street, the trajectory would not have been at a very sharp angle, but rather would have

been as the pathologist stated "essentially in a line parallel to the ground."

This is the factual background to which we apply the definition of involuntary manslaughter. Section 9—3(a) provides: "A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are. likely to cause death or great bodily harm to some individual, and he performs them recklessly." Ill. Rev. Stat. 1965, chap. 38, par. 9—3(a).

As heretofore noted, the only direct evidence as to the line of fire was that the defendant shot toward the ground to scare the intruder. His wife, vouched for by the prosecution when it called her, testified unequivocally that the gun was pointed down as it fired. The prosecution brought out (apparently to weaken her testimony) that she could not see the trigger pulled, but it is a matter of common knowledge that a pistol fired in the dark throws a jet of fire for some distance from the muzzle. The shooting of a .22 caliber pistol toward the ground is not *per se* reckless and is not such an act as would likely cause death or bodily harm to a person some distance away. Firing into the ground or into the air to frighten a marauder in order to keep him from returning is not, in our opinion, such a reckless act as to justify conviction of involuntary manslaughter. Of course, we do not lightly set a verdict aside and do so only where it is palpably contrary to the weight of the evidence. (*People* v. *Solomon*, 24 Ill.2d 586; *People* v. *Brown*, 16 Ill.2d 482.) Here, the evidence supports a theory of innocence and the prosecution's case, consisting of bits of purely circumstantial evidence, was not strong.

The defendant did not help his case by a statement made that night. Several hours after the shooting he was awakened by the chief of police who was accompanied by a Captain Faux and asked if he had heard any unusual noises. He said

no. His reason was that he did not have money with which to pay a fine for discharging a firearm within the city limits. He said that the officers did not tell him that anyone had been killed or even that a person had been shot, but merely that they were making a routine check for a disturbance in the neighborhood. His wife said she could not remember that anything was said about someone being shot. The police chief testified that he said as they were leaving "At the moment, we are investigating a murder." Captain Faux did not testify at all.

The following morning defendant was asked to accompany the officers to the police station and upon learning of the death he told of firing a shot. The police assumed it came from one of two rifles which they saw hanging on the wall in defendant's home the night before, but defendant said that he had fired a revolver. He then gave the statement relative to the happenings the night before to the chief and three other police officers after waiving his right to counsel. This statement was practically identical with his testimony at the trial.

There was ample evidence of defendant's good reputation. He purchased the .22 caliber pistol for target practice from a sport shop in Coffeeville, Kansas, where he was reared and went to school. In 1956, at 18 years of age, he moved to Pekin where he was employed by Caterpillar Tractor Company and worked there continuously, except for the time spent in jail following this indictment, up to within one day of the trial. He had never before been in trouble.

The evidence in this case leaves serious and abiding doubt as to the guilt of the defendant. While action of this young householder was not necessarily the exercise of best judgment, the protection of his family by firing a shot from a target pistol to frighten and discourage the return of a prowler is understandable. He could not reasonably foresee that his act was likely to result in serious injury or death.

The judgment of the Appellate Court, Third District, affirming the judgment of the circuit court of Tazewell County is, accordingly, reversed.

*Judgment reversed.*