THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WESLEY
KELLY, Defendant-Appellant.

(No. 73-97;

Second District (2nd Division)—January 24, 1975.

Charles S. Wilson, III, and Charles F. Scott, both of Waukegan, for appellant.

Jack Hoogasian, State's Attorney, of Waukegan (Ivan H. Tepper, Assistant State's Attorney, and James W. Jerz, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

The defendant, Wesley Kelly, was indicted for murder and voluntary manslaughter. After a jury verdict finding him guilty of involuntary manslaughter, he was sentenced by the Circuit Court of Lake County to 5 years' probation with the first year to be served on a work-release program.

He appeals, contending:

1. That since he was not indicted for involuntary manslaughter, the jury should not have been instructed regarding the offense.
2. That his testimony did not establish the offense of involuntary manslaughter and there was not sufficient evidence to submit the question to the jury in that.
3. That there was no affirmative testimony of recklessness.
4. That he was not proved guilty beyond a reasonable doubt in light of testimony regarding self-defense.
5. That refusal of certain defense instructions regarding self-defense was error.
6. That refusal to give an instruction regarding accidental death was error.
7. That admission of a pathologist's testimony and the showing of a picture of decedent was error.
8. That statements of the prosecutor during closing argument deprived him of a fair trial.
9. That a review of the entire record indicates that he did not receive a fair trial.

On September 17, 1972, defendant and his wife were at home awaiting the return of Joey Stock, her child of a former marriage to Joseph Lee Earl Stock III. Stock had the child for the day which ended with a dinner party celebrating his brother's birthday. Stock stayed late at the party where he had drunk wine and screwdrivers. When he drove back to the Kelly residence to return Joey he had with him Virginia Pond, his girl friend, Jacqueline Blaese, his niece, and Joey. It was dark but a porch light was on.

When Stock arrived at the Kelly residence about 35 minutes late, the defendant answered the door. He told Stock that his wife was worried and that Stock should have called. Stock replied, "I don't give a damn. I don't have the number on me. You stupid son-of-a-bitch, can't you see what the weather is like?" Leaving the boy, Stock walked down the steps, turned around and said, "I'll take that wooden leg off you and beat you over the head with it." (Defendant has an artificial leg.) He called defendant a chickenshit and asked him to come onto the porch. Defendant refused because his wife and the boy were there.

Stock returned to his car, hit the steering wheel and said Kelly was a son-of-a-bitch. He then returned to the Kelly residence where he met Mrs. Kelly at the door. He said, "I want Joe [Kelly's nickname]." When defendant appeared, Stock continued saying "come on, come on, come on." Defendant was talking to Miss Pond when he was struck in the face by Stock who threw the first blow. Miss Pond intervened between the two. Kelly pushed back and Stock went off the porch and while kneeling on the ground removed his belt and wrapped it around his hand. Defendant went into the house and returned within a few seconds with a .22-caliber revolver.

Defendant testified that when he returned to the porch with the gun, Miss Pond was still holding back Stock who had a belt wrapped around his hand. Stock pushed the girl friend aside. Kelly told Stock he had a gun, pointed it at the road and pulled the trigger twice but the gun did not discharge. He lowered the gun to see why it did not go off. He looked up and saw that Stock had pushed the girl friend aside. He warned Stock, "Don't come no closer." He squeezed the trigger again to give a warning shot and the bullet struck Stock in the lower midpoint of the forehead. He said the purpose of squeezing the trigger this third time was to fire a warning shot, that he did not intend to shoot the decedent; that at no time did he ever intend to hit the decedent, that he did not know the gun was pointed at Stock, he was not aiming at anything but did admit that it was pointed in Stock's direction, and that just before the fatal shot was fired Stock was coming at him with the belt.

A ballistics expert testified that he test-fired the gun for accuracy at

8 feet and failed to hit target, that because the rifling in the barrel was so poor the bullets came tumbling out of the barrel and that with the gun aimed between a subject's eyes and discharged the bullet would not strike the subject or any part of his body.

The jury was instructed on the crime of murder, voluntary manslaughter and, over objection of defendant, involuntary manslaughter.

On appeal defendant argues that since he was not indicted for involuntary manslaughter and the State's case contained no testimony to establish the element of recklessness necessary for involuntary manslaughter, it was error to instruct on this lesser offense.

We think there was sufficient evidence to warrant a finding of involuntary manslaughter, because the jury was entitled to believe that the defendant had acted recklessly and in such fashion that his act was likely to cause death or great bodily harm.

Section 9—3(a) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—3(a)) defines involuntary manslaughter:

"(a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly."

Section 4—6 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 4—6) provide in part:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

The Committee Comments to section 9—3 (S.H.A. ch. 38, § 9—3, at 245 (1972)) point out that the clause, "whether lawful or unlawful" was added to make clear the departure from the wording of the former Illinois statute which drew a distinction between lawful and unlawful acts.

■■ Involuntary manslaughter is an offense which happens without the intent to inflict injury, and death results from acts performed recklessly. *People v. Johnson,* 54 Ill.App.2d 27, 36.

■■ It is a well-established rule of common law, incorporated by judicial adoption into the jurisprudence of Illinois, that the jury may, under an indictment charging murder, return a verdict convicting the accused of any lower degree or grades of homicide included in the charge, provided there is evidence to support the lower grade or degree.

(*People v. Lewis*, 375 Ill. 330, 334.) In *Lewis* the defendant contended, as here, that he was convicted of an offense with which he was not charged, in violation of the due process clause of the constitutions. The court gave a thorough and extended discussion, holding that the indictment for murder included manslaughter, and defendant was thereby advised of the charge and had no ground to complain that his rights under the due process clauses had been invaded.

■■ Many cases have specifically held that involuntary manslaughter is a lesser included offense to a charge of murder, and where there is sufficient evidence from which the jury could find that the defendant was guilty of involuntary manslaughter, it is correct to give an instruction on involuntary manslaughter. *People v. Barksdale*, 131 Ill.App.2d 103; *People v. Arndt*, 50 Ill.2d 390, 394.

Further, if the evidence would support a verdict of manslaughter, a defendant will not be heard to complain that a manslaughter instruction was given, even though he did not request it. It is only where the evidence establishes that defendant is guilty of murder or is not guilty, as for example in cases in which the defense is alibi, or mistaken identity, that a defendant may be said to have a right not to have the jury charged as to lesser included offenses. *People v. Taylor*, 36 Ill.2d 483, 489.

■■ In the instant case the defendant admitted that the gun was pointed in decedent's direction when he fired the fatal shot. A Lake County deputy testifying for the State stated that shortly after the shooting Kelly admitted to him that he was aiming at Stock at the time he shot. In a statement made to assistant State's attorney Ori, defendant said he shot at Stock. It was a question for the jury whether firing a gun aimed toward the decedent was a reckless performance of an act likely to cause death or bodily harm to a person 18 feet away. Obviously the jury believed defendant's testimony that he did not intend to kill but rejected his theory that he had a right to exercise deadly force in defense of his person when confronted with a man wielding a belt, or that it was a mere accident that Stock was shot.

Defendant argues that all of the evidence of recklessness came in the defendant's case and therefore the State had no right to seek an involuntary manslaughter instruction when the only evidence of recklessness came from the defendant himself.

■■ One who is accused of crime has a privilege not to be compelled to give self-incriminating testimony but when the accused takes the stand in his own behalf after an informed and intelligent choice he waives that privilege and may incriminate himself. Once evidence is admitted it is

in the case for all purposes without regard to who produced it. The evidence as a whole must be considered. The same rule with respect to testing the evidence applies as in a civil action. (23A C.J.S. *Criminal Law* § 1145 (3), note 61 (1961).) A motion for directed verdict made at the close of all the evidence must be considered in the light of all the evidence, including that given by accused (23A C.J.S. *Criminal Law*, § 1149, note 49), and it is the province of the jury to determine the guilt or innocence of accused on all the evidence.

■■ Further, there was evidence in the State's case to establish recklessness. The only eyewitness presented by the State, Virginia Pond, testified that Kelly aimed his gun at Stock and shot him. The deputy Schrader testified that Kelly admitted that he fired the shot in the direction of Stock. The jury could conclude that Kelly recklessly fired a deadly weapon in the direction of Stock at close range and reject the possibility that he was intentionally aiming the gun. The State's firearms expert testified that there were certain malfunctions in the weapon. From this the jury could infer that Kelly was reckless in shooting a defective weapon in the general direction of Stock. The State's evidence established that Kelly either shot while aiming directly at Stock intending to kill or shot in the general vicinity of Stock, aiming so close that his conduct was reckless.

In argument 4 defendant alleges that there was insufficient evidence to sustain the guilty verdict. His primary argument is that the evidence established that he was acting in self-defense when he fired the fatal shot and therefore the killing was justified by virtue of section 7—1 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 7—1). Alternatively, he argues that even if he was not justified in the use of deadly force, the killing was only an accident and the evidence failed to establish recklessness.

It is undisputed that deceased and defendant engaged in a heated verbal exchange and that a scuffle ensued. That defendant went into his home and up to his bedroom to obtain a gun. When he returned to the porch Stock was 18 feet away with the belt wrapped around his hand. Kelly said he did not intend to kill but only to warn.

Section 7—1 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 7—1) provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily

harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

Applicable committee comments to this section state;

"(1) The person must not be the aggressor;  *  *  *

(2) The danger of harm must be a present one, not merely threatened at a future time, or without the present ability of carrying out the threat;

(3) The force threatened must be unlawful—either criminal or tortious;

(4) The person must actually believe that the danger exists, that his use of force is necessary to avert the danger, and that the kind and amount of force which he uses is necessary; and

(5) His belief, in each of the aspects described, is reasonable even if it is mistaken.  *  *  *  in determining whether the use of force is necessary, the person need not consider whether the danger might be avoided if he were to give up some legal right or privilege."

■■ Did Kelly have a right to reasonably believe that his use of deadly force was necessary to prevent imminent death or great bodily harm? It is a question of fact for the jury. (*People v. Taylor*, 6 Ill.App.3d 335; *People v. Wilson*, 3 Ill.App.3d 481, 486.) Of critical significance in determining whether a defendant had the right to use deadly force is his own state of mind. The test here can be subjective. A killing may be justifiable under section 7—1 even though the danger facing the defendant is not real. If the defendant had reasonable ground to believe himself in danger of losing his life or suffering great bodily harm he may protect himself even if he is mistaken and the danger only apparent. Whether the danger is actual or apparent does not depend upon the assailant using a deadly weapon or having one in his possession. *People v. Lockett*, 85 Ill.App.2d 410, 414.

However, the privilege of using deadly force requires further restriction—a limitation to the situation in which the force imminently threatened apparently will cause death or great bodily harm, or in which violent offense is being committed which in its nature involves serious risk of great bodily harm.

Illinois courts have refused to require retreat and especially so when in one's own curtilage. "Reasonably believes," as defined in section 2—19 of the Criminal Code, "means that the person concerned, acting as a reasonable man, believes that the described facts exist."

In section 7—1, the described facts are the other person's imminent use of unlawful force, the necessity of using force to defend against it and the proper quantity of force necessary for defense.

■■ Self-defense presupposes the intentional use of force in defense of one's person. (*People v. Johnson*, 54 Ill.App.2d 27.) The test is whether accused honestly believed that he was in such danger, or apparent danger, as required the means taken for his protection. (*People v. Edwards*, 389 Ill. 563.) Under these circumstances a person may deliberately use a deadly weapon in self-defense. (*People v. Hannon*, 381 Ill. 206.) Where the evidence on an issue is legally sufficient and is in conflict or more than one inference reasonably may be drawn therefrom, the question is for the jury. Under such circumstances it is for the trier of fact to determine malice, intent, passion or provocation, whether or not accused acted in self-defense, or whether the facts and circumstances were such as to induce a reasonable apprehension of loss of life or great bodily harm by the person assaulted, so as to entitle him to take the aggressor's life in self-defense. 21 I.L.P. *Homicide* § 132 (1956).

In the instant case Miss Pond testified that she observed Kelly come to the front porch and aim a gun towards Joseph Stock, who turned toward Kelly and was immediately shot. By her account Stock had not struck an attack posture. Kelly testified that after the shooting Miss Pond asked him why he shot. He said he pulled the trigger because Stock had been "egging him on." Nowhere in Kelly's testimony did he assert that he actually believed that Stock posed an imminent threat to inflict great bodily harm upon him. Because of defendant's own testimony as to his state of mind at the time he shot, the jury was justified in concluding that he had no right to use deadly force when he did.

In the alternative defendant argues that even if he was not justified in pulling the trigger, the killing was a mere accident because of the weapon being defective in its aim. Defendant admitted that he shot at Stock; further, when asked for a blanket to cover Stock who was lying wounded on the ground, he stated, "He don't deserve it."

Defendant in his argument relies heavily upon *People v. Post*, 39 Ill. 2d 101. In that case the facts were that accused fired toward the ground to scare an intruder. The court stated, "Firing into the ground or into the air to frighten a marauder in order to keep him from returning is not, in our opinion, such a reckless act as to justify conviction of involuntary manslaughter." The case is clearly distinguishable on the facts.

■■ In the instant case the evidence does not require a finding as a matter of law that death had occurred by accidental means. Here, where the accused admits firing the fatal shot while aiming at or in the direc-

tion of the decedent, it is the province of the trier of fact to determine whether the killing was by misadventure or by reckless conduct. *People v. Washington*, 27 Ill.2d 104; *People v. Green*, 23 Ill.2d 584.

We are, therefore, of the opinion that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of the crime of involuntary manslaughter.

■■ Defendant next contends that there was error in refusing two of his instructions. The instructions related to the justifiable use of force and burden of proof thereof. Neither of them are found in IPI—Criminal. Supreme Court Rule 451 (50 Ill.2d R. 451) in applicable part provides:

"(a) *Use of IPI-Criminal Instructions; Requirements of Other Instructions.* Whenever Illinois Pattern Instructions in Criminal Case (IPI-Criminal) contains an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the IPI-Criminal instruction shall be used, unless the court determines that it does not accurately state the law."

The IPI—Criminal instructions on self-defense (IPI—Criminal 24.06), and burden of proof (IPI—Criminal 25.05 and 2.03) clearly, concisely and impartially state the applicable law and are the instructions which are required to be given under Rule 451.

Defendant also tendered an instruction defining accident which was refused by the trial court. In *People v. Witherspoon*, 55 Ill.2d 18, 24, the court pointed out that the present criminal code contains no reference to death by misadventure and stated: "An instruction on death by misadventure simply tells the jury that the defendant must be found not guilty if the requisite mental state is lacking to establish the particular homicide crime with which the defendant is charged. (See Ill. Rev. Stat. 1967, ch. 38, art. 4 and art. 9.) This is an inverted way of instructing the jury as to the elements of the crime of murder and that the burden of proving beyond a reasonable doubt every material allegation of the offense rests upon the State.

"Since the statute no longer contains the affirmative defense of death by misadventure and since the jury was properly instructed as to the mental state required before the defendant could be found guilty, the giving of the refused instruction was necessary." The court concluded, "If the jury receives the appropriate instructions from chapter 7, we can see no need for the giving of an instruction concerning death by misadventure." 55 Ill.2d 18, 25.

In argument 7 the defendant contends that the pathologist's testimony and a picture of decedent were introduced to induce the jury to dwell

upon gory details of the death of Joseph Stock and not to prove the point in issue.

■■ In support of this proposition the defendant cites several cases such as *People v. Lefler*, 38 Ill.2d 216, proscribing the use of photographs of the *corpse* unless such pictures are relevant as to a point in issue or serve to illustrate relevant testimony. Here the State did not introduce a photograph of the dead Joseph Stock. The exhibit showed Joseph Stock alive and well prior to the night of September 17, 1972. The picture of a smiling Joseph Stock would not induce the jury to dwell upon the gory details of his death. The photograph, illustrating the size and general physical build of decedent was relevant to the issue of justifiable use of force. The reasonable nature of Kelly's belief that he was in imminent danger of death or great bodily harm might depend in part, upon the size and strength of Mr. Stock. As in *People v. Le May*, 35 Ill. 2d 208, we feel the photograph in question in the case before us would establish facts in controversy material to the offense, and that the trial court did not abuse its discretion in admitting the photograph into evidence.

■■ Defendant also argues that because he had stipulated that a bullet fired by him from his gun caused the death of Joseph Stock he was prejudiced when the prosecutor was allowed to illustrate, on his own head by the use of a finger, the testimony of Dr. Vern L. Zech as to the point of entry of the fatal bullet and the place where the bullet eventually lodged. Dr. Zech's testimony as to the path of the bullet helped to establish the stance taken by Stock at the time Kelly fired. The position of Stock at that moment was probative for a determination of whether Stock was taking an attack position at that time and went to the issue of self-defense. As stated in *People v. Scheck*, 356 Ill. 56, 62: "It has never been held that the State is barred from proving a fact because the defendant offers to admit it, but, on the contrary, the rule is that when a trial is upon a plea of not guilty the State is permitted to go ahead and introduce its full proof of the crime charged in the indictment." The State had the right to prove every element of the crime charged and was not obligated to rely on the defendant's stipulation. *People v. Speck*, 41 Ill.2d 177, 201-202.

The defendant next contends that he was deprived of the right to a fair trial when the prosecutor misstated the evidence in his closing argument by stating that the defendant clicked the trigger on the weapon which killed Stock five times. He goes on to argue that the evidence only established that the trigger had been squeezed three times.

An examination of all of the trial testimony, especially that of firearms

expert, Susan Komar, reveals that it was quite likely that Kelly did click the trigger of his .22-caliber revolver five times. Miss Komar was shown People's Exhibit No. 11, which was an envelope containing four .22-caliber shells found on the bookcase in the Kelly house on September 17, 1972. She testified that she had examined these cartridges and determined that they were Federal .22-caliber short cartridges, three of which had fine firing-print impressions on them. The fourth did not. When asked how a firing-print impression could appear on a live round of ammunition, Miss Komar stated that it was possible that an attempt was made to fire the cartridge, but that for some reason it did not fire.

This testimony must be considered in examining the entire thrust of the prosecutor's theory as to how many times the defendant pulled the trigger. He stated that theory as follows:

"Members of the Jury, here is the diagram made by Deputy Cook and you will recall what his testimony was. The darkened portions, that is chambers three, four, five and six contained live rounds, and further that these other two chambers, one and two, were empty. That's the way the gun was when he found it. Of course, by the testimony of the defendant, the defendant removed a couple of rounds from that particular exhibit.

Now then the testimony of Susan Komar which revealed that rounds three, four and six had firing pin impressions on them, I submit to you, members of the Jury, the manner in which this gun was fired was as follows and this is a reasonable inference from the testimony.

First of all, the defendant first pointed the gun at Joseph Stock, number five. It was in the upper position. That would be in the position which would be shot. Defendant pulled the trigger, the cylinder rotated, pulled the trigger, number four rotated clockwise and comes under the hammer. The firing pin impression is down on number four indicating the hammer came down on it and the bullet misfired. Next, three, there is a firing pin impression there. Again the trigger is pulled again and the gun misfires and two and one, we don't know. One of those contained, of course, the bullet that killed Joseph Stock.

What is important, members of the Jury is that number six also had a firing pin impression on it and I submit to you, members of the Jury, what the defendant did in this case was click that trigger five times. The first time was chamber number four.

MR. WILSON: There is absolutely no evidence on either side of this case that the gun had been attempted to be fired more than three times by either —

THE COURT: I'm going to let him argue from the facts in evidence.

MR. LANG: The testimony of Susan Komar, I asked the question, 'How does a firing pin impression come to be on a live round?' These are live rounds. Her testimony was a firing pin was hitting it, but not with enough force to hit the primer and cause the bullet to go off. I submit the defendant pulled the trigger five times. The first time was on four and three.

We've got the firing pin impressions to show they were fired, two and one. I don't know which one of those were the death bullet. One of them was, but even after the shot was fired that killed Joseph Stock, the defendant pulled the trigger again, again pulled the trigger. We have a firing pin impression on chamber number six, another impression."

Since two of the six chambers in the weapon used to kill Stock were empty, having been removed by defendant, and three of the four rounds left in the gun had firing pin impressions on them, it was perfectly proper for the prosecutor to argue that the defendant pulled the trigger five times.

The defendant also takes exception to the argument that, to Virginia Pond, the .22 carried by the defendant looked like a .45-caliber machine gun. Defense counsel objected to this characterization and the trial court sustained the objection noting that the weapon was not a machine gun. The comment objected to was contained in the following thoughts conveyed by the prosecutor:

"He comes out of that porch and he has a gun in his hand and he stands a few feet from her and points the gun in the direction of Joe Stock. You are Virginia Pond. I come out obviously angry. I had just been in an argument. I come out with a weapon. How many are going to grab this weapon from my hand?

She was excited. She said no, you don't have to kill him. You don't have to shoot him and indeed this would be a mature reaction, would it not? She was awe-struck to see this weapon. This weapon looked like a .45 caliber machine gun.

MR. WILSON: I'm going to object to that.

THE COURT: It is not a machine gun. I will sustain the objection.

MR. WITT: This weapon was immense to her, was it not, at that moment when it was pointed by the defendant at her lover and then he stood there and she said, 'Oh, no, you don't have to shoot him,' as he pulled the trigger five times."

It is clear from a reading of these remarks that the State's Attorney

was not arguing to the jury that the defendant *actually* carried a .45-caliber machine gun. Obviously, the State's Attorney was speaking figuratively and not giving his literal account of the evidence when he said the weapon appeared to be a .45-caliber machine gun to Miss Pond. Whatever error may be present in the use of such allegory, it certainly could not have affected the deliberations of the jury nor did it deprive the defendant of a fair trial, especially since the trial court corrected the prosecutor in sustaining defense counsel's objection and the prosecutor immediately abandoned his characterization of the weapon as a machine gun. *People v. Stark*, 33 Ill.2d 616, 213 N.E.2d 503.

A judgment will be reversed only when it is reasonably clear that improper remarks influenced the jury in a manner that resulted in substantial prejudice to a party. *People v. Stahl*, 26 Ill.2d 403; *People v. Miller*, 30 Ill.2d 110.

Defendant's last assignment of error is in several parts. First, he contends that because he was not admitted to bond and was in jail continuously from September 17, 1972, until after trial, he was not able to show his counsel the physical layout of where the shooting took place or the places where various individuals stood at relevant times.

In *People v. Harris*, 38 Ill.2d 552, 555, the court said, "Both as a practical matter and a procedural matter, review of an order denying bail must be raised prior to trial and conviction." After Harris was decided, Supreme Court Rule 604 was amended in 1971 by adding paragraph (c) to establish a simple procedure for appeals from orders in criminal cases concerning bail. (Prior to its adoption, the only avenue of relief was an original petition to the supreme court for a writ of habeas corpus.)

At the hearing on the motion for bond there was testimony of Ben Ori, first assistant State's attorney, regarding a statement made by the defendant:

> "And I asked Mr. Kelly why he didn't close the door, go back into the house and close the door. He related to me that this was something that had to come to a head, it had been going on for three years and it was just something that had to come to a head and putting it off at this time, it would come up again some later time."

The court in its ruling stated:

> "I am going to deny the motion for bail. I believe the proof is evident and I believe the presumption is great. I think something that wasn't commented on, I think is in the record, it's perfectly obvious, there was bad blood between these two people for a considerable period of time. Obviously, the defendant was in control of the situation. The evidence is, after being struck, he knocked

the decedent off the porch, shot him from some distance away. * * *"

At that time the defendant's attorney asked for and was granted full access by his investigators to the defendant in the County Jail at reasonable times. The court went on to state:

"The only thing I can see, despite my feeling about the bond, if it should appear he is not in a position to get what is adequate for his defense, I would probably have to reconsider the bond question. * * *"

■■ The question of bond was never raised again, so it would appear that, despite his incarceration, the defendant was able to assist in the preparation of his defense to the satisfaction of defense counsel.

Defendant further contends that he was prejudiced because during voir dire, Mr. Kenneth Blaese and Deputy William Eye, relatives of the decedent, sat among veniremen. One bailiff had advised defense counsel that decedent's brother was "moving all over the court room." Another bailiff, Stickles, had advised counsel that Blaese was sitting next to a juror.

Blaese was sworn and testified that he did not in fact sit near anyone unknown to him and did not talk to any jurors about the case. The court told him to stay away from any jurors.

Bailiff Stickles was sworn. He testified that the last juror selected (Smith) had sat next to a woman who was sitting near Blaese and that he then ran Smith into the jury room.

The juror Smith was never recalled to determine if in fact he had been talked to or overheard any conversation about the case. No motion for mistrial was made. No prejudice has been shown, in fact no communication or misconduct calculated to influence a juror was shown.

Parties, and other persons connected with a case or having some interest therein, including counsel, witnesses, and relatives of parties, should carefully avoid private conversations and social intercourse with jurors. The rule is based on the policy of the law to keep the jurors free from influences tending to prejudice them against or in favor of either party and is designed to maintain integrity of judicial procedure and impartial justice. 75 Am. Jur. 2d *Trial* §§ 1005, 1008 (1974); Annot., 9 A.L.R. 3d 1275 (1966).

■■ During a criminal trial, in a homicide case especially, the jury, from the time of being sworn until deliverance of their verdict, should be kept as free as practicable from all, even appearances of, opportunity for communicating with outside parties, *or even appearances of*, opportunity for communicating with outside parties, or receiving communications from them. (75 Am. Jur. 2d *Trial* § 1010 (1974).) Just

as a reversal or a new trial will not be ordered because of a conversation between a juror and a third person which is of a harmless character and unrelated to the case (*People v. Strause,* 290 Ill. 259, 285-289), so we believe that where, as here, there was an opportunity for but in fact no communication shown, a new trial should not be ordered.

As to Deputy Sheriff Eye, the following occurred early during impanelment of jurors:

> "Defense Counsel: I now notice a deputy sheriff who coincidentally happens to be the step-father of the decedent now sitting in close proximity to the jury and I would ask that the situation be remedied.
>
> Court: Which one?
>
> Defense Counsel: Mr. William Eye in the brown suit.
>
> Ass't State's Attorney: On the very edge of the seat.
>
> Court: I will try and get all the jurors to the left and we will put everybody else on the other side."

Defendant in his brief has failed to point out why the above denied him a fair trial, and we do not believe it did.

For the above and foregoing reasons the judgment of the Circuit Court of Lake County is affirmed.

Judgment affirmed.

RECHENMACHER, P. J., and T. MORAN, J., concur.