**Donald MURRAY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 92–109.**

Supreme Court of Wyoming.

June 23, 1993.

Rehearing Denied July 20, 1993.

Leonard D. Munker, State Public Defender; Deborah Cornia, Appellate Counsel; Bill Combs, Asst. Public Defender; and Donald L. Fuller, Legal Intern, for appellant.

Joseph B. Meyer, Atty. Gen.; Sylvia Lee Hackl, Deputy Atty. Gen.; Barbara L. Boyer, Sr. Asst. Atty. Gen.; Theodore E. Lauer, Director of the Prosecution Assistance Program; and Paula Messer, Student Intern for the Prosecution Assistance Program, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

MACY, Chief Justice.

Appellant Donald Murray appeals from his conviction for involuntary manslaughter in violation of Wyo.Stat. § 6–2–105(a)(ii) and (b) (1988).

We affirm as modified.

Appellant presents the following issues for our consideration:

I. Whether wilful[ ] and wanton conduct by law enforcement agents in purposely failing to inform Mr. Murray of the reasons for his arrest in violation of W.R.Cr.P. 4(c) invalidates the arrest and requires suppression of statements attained during the illegal arrest?

II. Whether the evidence was sufficient to sustain a conviction for involuntary manslaughter?

III. Whether the trial judge failed to make a determination of defendant's ability to pay prior to ordering restitution and assessing penalties to be paid to the Wyoming victim's compensation fund?

Appellant and the victim worked together on an oil rig located near Granger, Wyoming. The men were good friends who had known each other since 1983. On September 30, 1991, they completed their shift on the oil rig at approximately 6:30 p.m. They began drinking shortly thereafter, and eventually went to the Cowboy Bar in Mountain View. While they were at the Cowboy Bar, the victim and Appellant started arguing about one of their co-workers. Appellant left the bar before the argument could escalate into a physical confrontation. He proceeded by himself to Pete's Bar where he ate pizza and continued drinking. At about 10:30 p.m., Appellant drove home.

At eleven o'clock that same evening, the victim had his cousin drive him to Appellant's house so that he could retrieve his work clothes which were in the back of Appellant's truck. As the victim's cousin drove down Appellant's driveway, she observed a flash from a gun barrel. While continuing on down the driveway, she saw and heard additional shots being fired and noticed Appellant standing on his porch holding a handgun. The victim exited the vehicle, identified himself, and explained to Appellant that he just wanted to get his work clothes. Appellant yelled " '[g]et off of my property' " to the victim. He fired three additional shots from his porch, two of which landed near the victim's feet. The victim again identified himself and started walking toward Appellant's truck. Appellant left his porch and walked toward the victim until they were approximately six feet apart. The victim said: " 'Just let me get my work clothes and we'll leave.' " Appellant repeated the command to get off his property. The victim said, " 'Okay. I'm leaving,' " turned around, and had started walking back towards the car when Appellant fired three or four additional shots. One of the bullets ricocheted off a rock and passed through the victim's right thigh, severing his femoral artery and femoral vein. The victim also suffered a relatively minor bullet wound to his right buttock. The doctor who performed the autopsy was unable to determine whether the two wounds were the result of a single gunshot or multiple gunshots.

The victim hopped back to the car after being shot. His cousin drove him to Pete's Bar which was located approximately two miles from Appellant's house. The victim's cousin and one of the bartenders placed the victim on the pavement in the bar's parking lot and elevated his leg with a stool. Another bartender telephoned 911. The ambulance arrived about half an hour after the 911 call had been placed. When the

ambulance arrived, the victim's vital signs were normal, and his level of consciousness indicated that he was in "great shape." The emergency medical technicians thought that the victim had lost only a minimal amount of blood. In reality, he had lost a massive quantity of blood during the time that it took to drive from Appellant's house to Pete's Bar. The victim lost consciousness shortly before reaching the hospital, his breathing became difficult, and his pupils dilated. The EMTs and the emergency room physicians were unable to resuscitate him.

Appellant was arrested and initially charged with second-degree murder. The deputy county and prosecuting attorney subsequently reduced the charge to involuntary manslaughter. A jury found Appellant guilty of involuntary manslaughter, and the court sentenced him to serve a term of not less than eight years nor more than fifteen years in the Wyoming State Penitentiary. Appellant filed a timely appeal with this Court.

### Rule 4(c)(3) of the Wyoming Rules of Criminal Procedure

■ Appellant argues that the trial court should have suppressed any statements he made while he was under arrest because the law enforcement officers violated W.R.Cr.P. 4(c)(3) (revised effective March 24, 1992). Before its revision in 1992, that rule provided in pertinent part:

(c) *Execution or service; and return.*

. . . .

(3) Manner.—The warrant shall be executed by the arrest of the defendant. The officer need not have the warrant in his possession at the time of the arrest, but upon request he shall show the warrant to the defendant as soon as possible. If the officer does not have the warrant in his possession at the time of the arrest, he shall then inform the defendant of the offense charged and of the fact that a warrant has been issued.

The evidence and testimony are consistent with Appellant's claim that the officers did not comply with W.R.Cr.P. 4(c)(3)'s requirements. Early in the morning of October 1, 1991, several officers from different law enforcement agencies surrounded Appellant's house. When Appellant emerged from his house, Steve Johnson, an officer with the Evanston police department, handcuffed him and took him into custody. As Officer Johnson was handcuffing him, Appellant asked, " 'What the hell's going on?' " and " 'It's [the victim], isn't it? Is he hurt bad?' " Officer Johnson told Appellant that he was under arrest and to "shut up." Officer Johnson and the officer who transported Appellant to the jail testified that they did not inform Appellant of the second-degree murder charge and that they did not advise him that an arrest warrant had been issued.[1] The officers explained that they knew a homicide had occurred and an arrest warrant had been issued for Appellant but that they were unaware of the precise charge.

Kyle Lamb, a detention officer with the Uinta County sheriff's department, who booked Appellant into the jail, also failed to inform him of the second-degree murder charge and of the existence of an arrest warrant. Appellant asked, among other things, what the charge was, and Officer Lamb told him that he did not know. The officer testified that he did not learn of the specific charge against Appellant until the end of the booking process when he received a facsimile of the arrest warrant. Rex Gaylord, an investigator with the Uinta County sheriff's office, was also present when the facsimile arrived. According to Officer Lamb, Investigator Gaylord instructed him not to advise Appellant of the charge as he would inform Appellant. Investigator Gaylord testified that he never instructed Officer Lamb not to advise Appellant of the charge.

At one point in the booking process, Appellant also asked Investigator Gaylord to inform him of the charge. Investigator

---

**1.** It appears from the record that the transporting officer informed Appellant during the booking process that a warrant existed.

Gaylord told him that they would discuss it in a few minutes. The investigator explained that he did not discuss the charge when asked because he wanted to preserve possible evidence of gun shot residue which may have been on Appellant's clothes before talking to him. Approximately ten minutes after Appellant asked what he was charged with, Investigator Gaylord took him to the interview room where they met Kevin Smith, an investigator from the county attorney's office. Investigator Smith immediately advised Appellant of his *Miranda* rights. Appellant waived those rights and proceeded to offer a detailed description of the prior evening's events. Just over fourteen minutes into his statement, Investigator Smith informed Appellant for the first time that the victim had died and that he was charged with second-degree murder. Investigator Smith's reason for not immediately informing Appellant of the second-degree murder charge was that he wanted to discover Appellant's motive and intent in shooting the victim.

Prior to trial, Appellant moved to suppress the statements he made to the officers. He based his motion on, among other things, the officers' violation of W.R.Cr.P. 4(c)(3). The trial judge agreed with Appellant that the officers did not fully comply with the rule. However, he found that suppressing the evidence was not the appropriate remedy because the officers violated a procedural rule rather than Appellant's constitutional rights. On appeal, we will uphold the district court's denial of a defendant's motion to suppress unless the denial was clearly erroneous. *Roose v. State*, 759 P.2d 478, 487 (Wyo.1988).

Appellant argues that the officers illegally arrested him when they failed to comply with W.R.Cr.P. 4(c)(3) and that all subsequent statements should have been suppressed as being fruits of that illegal arrest. Appellant finds support for his claim in several United States Supreme Court decisions which hold that a defendant's statements made following an illegal arrest are not admissible unless the prosecution can show "not only that the statements meet the Fifth Amendment voluntariness standard, but also that the causal connec-

tion between the statements and the illegal arrest is broken sufficiently to purge the primary taint of the illegal arrest." *Dunaway v. New York*, 442 U.S. 200, 204, 99 S.Ct. 2248, 2252, 60 L.Ed.2d 824 (1979). *See also Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

The Supreme Court cases upon which Appellant relies concern the admissibility of a defendant's statements following an *illegal arrest;* i.e., one without probable cause. This underlying premise is noticeably absent from the facts of this case. The trial court accurately described Appellant's arrest as being one "made pursuant to a warrant issued by a magistrate upon probable cause supported by oath, affirmation and affidavit."

Appellant maintains that our decision in *Roberts v. State*, 711 P.2d 1131 (Wyo.1985), supports his theory that the officers' W.R.Cr.P. 4(c)(3) violation rendered his arrest illegal. *Roberts* was a resisting arrest case where the defendant argued that he had not been informed of the grounds for arrest and the existence of a warrant in violation of W.R.Cr.P. 4(c)(3). The jury was instructed: " '[T]he failure to inform the Defendant of the purpose for the arrest does not invalidate the arrest.' " 711 P.2d at 1136 (emphasis omitted). This Court held in a plurality opinion that the instruction was an incorrect statement of the law. In somewhat cryptic language, we explained:

> [W]e do not think that a total failure to inform the arrestee can be overlooked. Rule 4 says that the officer shall inform the defendant of the offense charged if he does not have the warrant available to show the defendant. The rule recognizes that people ought to know why they are being arrested. If the warrant is not available to support the arrest, then the officer should at least give the reason orally; and, if he fails to do so, the arrest should be *invalid for at least some purposes*.

*Id.* (emphasis omitted and added). The opinion does not specify for what "pur-

poses" an arrest should be invalidated. Nor is it clear whether an invalid arrest is the same as an illegal arrest. In any event, the cited language does not provide adequate authority for the proposition that a W.R.Cr.P. 4(c)(3) violation renders an arrest illegal. First, three justices did not join in the quoted portion of the opinion. 800 P.2d 1145. Second, the statement was dictum. Accordingly, we reject Appellant's theory that the officers' W.R.Cr.P. 4(c)(3) violation made his arrest illegal.

■ Despite the fact that Appellant was not illegally arrested, we must still determine the appropriate remedy, if any, for a W.R.Cr.P. 4(c)(3) violation. The rule itself does not specify a particular remedy. One method for deterring future violations would be to exclude any evidence which had been obtained in violation of the rule. However, we are not convinced that every violation of the rule warrants exclusion of the evidence. The difficulty in arriving at an appropriate remedy is that the rules, by their nature, "blend constitutional limitations on police activity, procedural limitations designed to avoid constitutional violations, and purely administrative 'housekeeping' regulations." *United States v. Searp*, 586 F.2d 1117, 1123–24 (6th Cir. 1978), *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979). The remedies should vary accordingly. When the violation compromises a substantial or constitutional right, the exclusionary rule is an appropriate remedy, especially when the right is related to Fourth Amendment protections. *See* Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 3.1(e) at 146 (1984). But, when the violated rule is merely ministerial or technical, the exclusionary rule becomes a remedy out of proportion to the benefit to be gained. The problem is in ascertaining whether the violation implicates a substantive right or merely a procedure designed to protect that right.

■ We conclude that in this case the officers' conduct did not implicate a sufficiently substantive right to warrant exclusion of Appellant's statements. We have not located any cases which analyze the exclusionary rule's applicability to evidence obtained in violation of W.R.Cr.P. 4(c)(3). *See Bryson v. United States*, 419 F.2d 695 (D.C.Cir.1969); and *United States v. $64,000.00 in United States Currency*, 722 F.2d 239 (5th Cir.1984) (both cases allude to the exclusionary rule as being a possible remedy). However, several state and federal courts have developed a useful test for determining the exclusionary rule's propriety in the analogous situation of search warrants which are issued or executed in violation of Fed.R.Crim.P. 41 or its state counterpart. In *United States v. Shelton*, 742 F.Supp. 1491 (D.Wyo.1990), the United States District Court for the District of Wyoming stated the rule as follows:

> "[V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule."

742 F.Supp. at 1502–03 (quoting *United States v. Burke*, 517 F.2d 377, 386–87 (2d Cir.1975)). Although this test is phrased in terms of a search warrant, the same questions of "prejudice" and "intentional and deliberate disregard" are appropriate for deciding whether evidence obtained in violation of W.R.Cr.P. 4(c)(3) should be excluded.

To determine whether Appellant suffered any prejudice in this case, we consider the officers' violation in light of the rights which W.R.Cr.P. 4(c)(3) was designed to protect. We discern two rights which the rule might be designed to protect.[2] First, it may prevent the unexplained detention of a lawfully arrested defendant. *Bryson*, 419 F.2d at 701. Appellant suffered no

---

**2.** The *Bryson* court suggested that the rule might also be designed to prevent unexplained arrests. 419 F.2d at 701. As noted in *Bryson*, this interpretation would require the police to inform a defendant of the reason for his arrest prior to

the actual apprehension. We do not interpret the rule to require an officer to give such information prior to making an arrest. *Roberts*, 711 P.2d at 1136 n. 4; 800 P.2d 1145 (Rooney, J., specially concurring).

such bewilderment in this case. It was obvious from Appellant's statements throughout the arrest and booking procedure that he realized he was under arrest for shooting the victim. Second, the rule may be intended to safeguard a defendant's privilege against self-incrimination. *Id.* Appellant's description of the shooting was certainly an incriminating statement. However, we fail to see how the officers' failure to immediately inform him of the precise charge led to his prejudicial statement. Appellant knew that the charge concerned him shooting the victim. He could have been charged with a variety of different crimes for shooting the victim. It is highly unlikely that Appellant's decision to make an incriminating statement hinged upon the particular crime with which he was charged. In fact, the interviewing officer asked Appellant immediately after informing him of the second-degree murder charge whether having that knowledge changed anything in his statement. Appellant responded in the negative.

The second element of the test in *Shelton* asks whether the officers intentionally and deliberately violated the rule. Courts have interpreted this portion of the test as requiring bad-faith conduct by the officers. *State v. Fixel,* 744 P.2d 1366 (Utah 1987); *Commonwealth v. Mason,* 507 Pa. 396, 490 A.2d 421 (1985). The arresting and detention officers in this case technically did not comply with the rule because they knew that an arrest warrant had been issued but failed to inform Appellant of its existence. Nothing in the record suggests that the officers deliberately violated the rule by not informing Appellant of the existence of the arrest warrant. The detention officer's testimony that Investigator Gaylord instructed him not to advise Appellant of the charge is of more concern. Investigator Gaylord denied giving such an instruction. Even if we assume that the detention officer was correct, it would appear that Investigator Gaylord meant only that he wanted to personally inform Appellant of the charge.[3] No evidence exists to suggest that the officers were conspiring to keep Appellant from knowing what the charge was. The most troubling conduct is Investigator Smith's failure to inform Appellant of the charge until they were well into the interview. Investigator Smith explained that he just wanted to learn why and how the shooting occurred before informing Appellant of the charge. We certainly do not condone the investigator's failure to immediately inform Appellant of the charge, and we fully expect it not to happen again; however, the facts do not support a finding that he deliberately, and in bad faith, violated the rule.

### Sufficiency of the Evidence

■ Appellant claims that the prosecution did not present sufficient evidence to sustain a conviction for involuntary manslaughter. He argues that, at most, the evidence supported a conviction for criminally negligent homicide. To review Appellant's sufficiency-of-the-evidence claim:

> " '[T]his court must determine whether, after viewing the evidence and appropriate inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt.' " *Jennings v. State,* 806 P.2d 1299, 1302 (Wyo.1991) (quoting *Munson v. State,* 770 P.2d 1093, 1095 (Wyo.1989)).

*Dreiman v. State,* 825 P.2d 758, 760 (Wyo. 1992).

Our involuntary manslaughter statute, § 6–2–105(a)(ii), provides: "A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied, ... [i]nvoluntarily, but recklessly." According to Wyo.Stat. § 6–1–104(a)(ix) (1988) (emphasis added):

---

**3.** Q. Were you instructed by anyone prior to the book-in, during the book-in and before Mr. Murray exited with Officer Gaylord, were you instructed by anyone not to advise Mr. Murray what the charge was or what the arrest was for?
A. Yes, I was.

Q. Who was that by?
A. I do believe it was Officer Gaylord.
Q. And he asked that you not explain that there was a homicide; is that essentially it?
A. Correct. He said that he was going to do that.

A person acts recklessly when he *consciously disregards* a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

■ The principal distinction between criminally negligent homicide [4] and involuntary manslaughter is whether the defendant consciously disregarded a substantial and unjustifiable risk or whether he failed, through criminal negligence, to perceive that risk. The Utah Supreme Court succinctly explained this distinction in *State v. Howard,* 597 P.2d 878, 881 (Utah 1979) (emphasis in original):

> The difference between the minimum required *mens rea* of recklessness for manslaughter and criminal negligence for negligent homicide is simply whether the defendant was *aware, but consciously disregarded* a substantial risk the result would happen, or was *unaware but ought to have been aware* of a substantial risk the result would happen.

Appellant testified in this case that he had served an extended tour of duty with the United States army in Vietnam, where he was a rifleman and a machine gunner. The army rated Appellant as being a sharpshooter. Both the army and Appellant's

father instructed him not to point a gun at anyone because someone could get hurt. His father also told him not to use guns when he had been drinking. Appellant admitted that, whenever someone discharges a gun, it is a terribly dangerous activity. Appellant was also an avid hunter who hunted with a wide variety of guns. A reasonable jury could infer from Appellant's extensive experience with weapons that he was aware of, but consciously disregarded, the substantial and unjustifiable risk that the victim could be injured by a ricocheting bullet.

In his brief, Appellant repeats his trial testimony that, on the night of the shooting, he did not realize he was engaged in a dangerous activity because he aimed the gun away from the victim. The victim's cousin contradicted this assertion with her testimony that some of the bullets raised the dirt near the victim's feet. Even Appellant testified that one of the bullets hit the dirt three or four feet from the victim's feet. In Wyoming, where rocks are plentiful, it is reasonable to infer that shooting at someone's feet creates a substantial and unjustifiable risk of injury resulting from a ricocheting bullet.[5]

### Restitution and Crime Victims' Compensation Account Assessment

■ As part of Appellant's sentence, the district court ordered him to pay a $50

---

**4.** Wyo.Stat. § 6–2–107(a) (1988) provides:
> (a) Except under circumstances constituting a violation of W.S. 6–2–106 [homicide by vehicle], a person is guilty of criminally negligent homicide if he causes the death of another person by conduct amounting to criminal negligence.

Wyo.Stat. § 6–1–104(a)(iii) (1988) provides in pertinent part:
> A person acts with criminal negligence when, through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation[.]

**5.** Appellant argues that *People v. Post,* 39 Ill.2d 101, 233 N.E.2d 565 (1968), mandates a contrary

result. In *Post,* the defendant fired a single shot into the ground to scare off an intruder. The shot apparently ricocheted and killed the intruder. The Illinois Supreme Court held:
> The shooting of a .22 caliber pistol toward the ground is not *per se* reckless and is not such an act as would likely cause death or bodily harm to a person some distance away. Firing into the ground or into the air to frighten a marauder in order to keep him from returning is not, in our opinion, such a reckless act as to justify conviction of involuntary manslaughter.

233 N.E.2d at 567. Obviously, several distinctions exist between *Post* and the present facts; e.g., Appellant fired several shots at the victim's feet, as opposed to firing a single warning shot; and the victim was a known friend as opposed to being a "marauder." We decline to follow *Post* to the extent, if any, our holding in the present case is inconsistent with the *Post* opinion.

surcharge to the crime victims' compensation account; $10,000 in restitution to the crime victims' compensation account; $1,075.31 for the victim's funeral and ambulance expenses; and twenty percent of his future net income, as defined by Wyo. Stat. § 20–6–301 (Supp.1992), as child support for the victim's minor children.

Appellant complains that the court violated Wyo.Stat. § 7–9–103(a) (Supp.1992) when it ordered him to pay for the victim's funeral expenses and twenty percent of his future net income as child support because the court did not find that he had an ability to pay. Section 7–9–103(a) provides:

> (a) The court shall require restitution by a defendant if it determines [or] finds that the defendant has or will have an ability to pay or that a reasonable probability exists that the defendant will have an ability to pay. If restitution is ordered, or at the time the defendant is placed on probation, the court shall fix a reasonable amount as restitution owed to each victim for actual pecuniary damage resulting from the defendant's criminal activity, and shall include its determination of the pecuniary damage as a special finding in the judgment of conviction or in the order placing the defendant on probation under W.S. 7–13–301. In determining the amount of restitution, the court shall consider and include as a special finding, each victim's reasonably foreseeable actual pecuniary damage that will result in the future as a result of the defendant's criminal activity. A long-term physical health care restitution order shall be entered as provided in W.S. 7–9–113 through 7–9–115.

In *Shongutsie v. State*, 827 P.2d 361 (Wyo. 1992), we interpreted the first sentence of § 7–9–103(a) as requiring the judge to specifically find that a defendant has a present or prospective ability to pay prior to ordering restitution. 827 P.2d at 369; *see also Leach v. State*, 836 P.2d 336 (Wyo.1992). We agree with Appellant that the trial court did not make such a finding in this case. Unfortunately, *Shongutsie* does not provide the quick and effective answer to this issue which Appellant anticipates.

Since deciding *Shongutsie* and *Leach*, we have become aware of an inconsistency between § 7–9–103(a) and Wyo.Stat. § 7–9–102 (Supp.1992). Section 7–9–102 states:

> In addition to any other punishment prescribed by law the court shall, upon conviction for any misdemeanor or felony, order a defendant to pay restitution to each victim as determined under W.S. 7–9–103 and 7–9–114 unless the court specifically finds that the defendant has no ability to pay and that no reasonable probability exists that the defendant will have an ability to pay.

Pursuant to § 7–9–102, the court is required to make a specific finding only when the defendant has no present or prospective ability to pay. If the defendant has or will have the ability to pay, the court must simply order restitution and does not need to make a specific finding. This contradicts the first sentence of § 7–9–103(a) which requires the court to order restitution "if it determines [or] finds" that the defendant has a present or prospective ability to pay. Section 7–9–103(a) indicates that finding an ability to pay is a condition precedent to ordering restitution.

Our overriding objective in construing these statutes is to ascertain and give effect to the Legislature's intent. *Parker Land and Cattle Company v. Wyoming Game and Fish Commission*, 845 P.2d 1040 (Wyo.1993). When two statutes, as here, are passed during the same legislative session and relate to the same subject matter, they are considered to be in pari materia. *Wyoming State Treasurer v. City of Casper*, 551 P.2d 687, 697 (Wyo. 1976). When statutes in pari materia are in apparent conflict, they should be construed in harmony with each other, if reasonably possible, so as to give force and effect to each. *Id.; City of Casper v. Joyce*, 54 Wyo. 198, 88 P.2d 467 (1939).

We believe that § 7–9–102 and § 7–9–103(a) can both be given effect with some minor modification. Section 7–9–102 defines a court's duty regarding restitution. The court is required to order restitution in all cases unless the court specifically finds that the defendant has no present ability

and no reasonably probable future ability to pay. Section 7–9–103(a) defines the process to be engaged in by the court to determine the amount owed. The only conflict is contained in § 7–9–103(a)'s first sentence regarding when the court must make a specific finding that a defendant has an ability to pay. That first sentence is not necessary to the process of determining the amount owed. Both statutes can be harmonized and given effect by simply disregarding § 7–9–103(a)'s first sentence. We are reluctant to ever construe any part of a statute as being surplusage; however, in this case it is the only way to give effect to both statutes to the fullest extent possible.

We note that a second reason to disregard the first sentence of § 7–9–103(a) is the ambiguity surrounding the language "determines [or] finds." The first sentence of § 7–9–103(a) was amended twice during the 1991 legislative session. The Legislative Service Office inserted the word "or" to reconcile the different amendments. Language inserted by the Legislative Service Office does not necessarily represent the Legislature's intent, and, consequently, we are reluctant to rely upon it.

 Henceforth, the court must make a specific finding only when the defendant does not have a present or prospective ability to pay. Although the court is not required to specifically find that a defendant has the ability to pay, the record must still contain evidence to support the existence of a present or future ability to pay. In this case, Appellant had a relatively stable work history. Appellant's brother-in-law testified at the sentencing hearing that Appellant could work for him in the air conditioning and refrigeration business. The judge could infer that Appellant had a prospective ability to pay.

Appellant also argues that the district court's directive that he pay $10,000 to the crime victims' compensation account was improper because the court did not find that he had an ability to pay. Wyo.

Stat. § 1–40–119 (Supp.1992) states in pertinent part:

> (a) In addition to any fine or other penalty prescribed by law, a defendant who pleads guilty or nolo contendere to, or is convicted of, the following criminal offenses shall be assessed a surcharge of not less than fifty dollars ($50.00):
>
> . . . .
>
> (c) Under no circumstances shall a court fail to impose the surcharge required by subsections (a) and (b) of this section if the court determines the defendant has an ability to pay or that a reasonable probability exists that the defendant will have an ability to pay.

We agree with Appellant that the court was required to find that he had an ability to pay before ordering the assessment. Consequently, we set aside that part of the order requiring Appellant to pay $10,000 to the crime victims' compensation account.[6]

Affirmed as modified.

---

**6.** The State argues that the $10,000 was restitution and should be dealt with pursuant to § 7–9–103(a). We agree with Appellant that, although not denominated as such, this was an assessment under § 1–40–119.