2019 IL App (1st) 171267-U

THIRD DIVISION
December 31, 2019

No. 1-17-1267

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 20813 |
| | ) | |
| NICOLE BAAR, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's conviction for uncharged offense of reckless discharge of firearm affirmed, as offense was lesser-included offense of aggravated discharge, and evidence was sufficient to prove reckless discharge beyond reasonable doubt. Counsel was not ineffective for failing to object to admission of victim's prior statements to police or to trial court's questioning of witness.

¶ 2   During an argument with Mark Anderson, defendant Nicole Baar fired a bullet into the wall of her kitchen and allegedly pistol-whipped Anderson in the chin. Defendant maintained that she fired a "warning shot," intended not to hurt Anderson—a boyfriend with a history of drunken physical aggression—but rather to scare him out of her house. The State saw matters differently and charged defendant with attempt murder, aggravated battery, and aggravated discharge of a firearm. After a bench trial, the trial court acquitted defendant of every charged

offense but found her guilty of the uncharged "lesser included offense" of reckless discharge of a firearm.

¶ 3    That offense, defendant claims, was not proven beyond a reasonable doubt. And in any event, she says, the trial court could not find her guilty of reckless discharge, because it was not a lesser-included offense of any crime(s) charged in the indictment. Alternatively, defendant argues that her attorney was ineffective for failing to object to the admission of Anderson's prior statements to the police, and to the trial court's *sua sponte* questioning of a witness, which elicited testimony that defendant admitted firing a shot at Anderson. We affirm.

¶ 4                                    BACKGROUND

¶ 5    Defendant and Anderson dated for a time, starting sometime in mid-2015 and ending later that year. On the evening of November 21, 2015, Anderson went to defendant's house after work. They soon began to argue.

¶ 6    Anderson testified that defendant was angry at him, in part because he was drunk—he acknowledged that he had been drinking "most of the day," despite being at work—and in part because he called an ex-girlfriend, Nanette Stokes, from defendant's house. While he was on the phone with Stokes, Anderson and defendant "got into an altercation" in the kitchen, which he described as "nothing very physical." Nobody else was present, and Anderson claimed to remember only "very small pieces" of the incident.

¶ 7    Anderson did not recall being shot at, but he "believe[d] it did happen," based on what he was "told" and the "pictures" he was shown. When he was asked whether he recalled hearing a gunshot, he testified, "I heard something, yeah." But he did not believe that any gunshot was "directly toward [him]." And he did not recall defendant hitting him with a gun. In fact, he did not recall seeing defendant with a gun at all that evening, although he knew that she kept one in

the house. He acknowledged that he had a small cut and bruise on his chin at the time, but he testified that he may have hurt himself at work, since he is a carpenter who routinely drinks on the job. Anderson denied that defendant ever held him at gunpoint or threatened to kill him.

¶ 8    After the altercation in the kitchen, defendant left Anderson alone and went to another room. Meanwhile, as Anderson recalled, Stokes had called 911 after she heard the altercation through the phone. Anderson remembered the police arriving at defendant's house, but he could barely remember speaking to them. He disclaimed any recollection of several specific statements that Sergeant Carroll would later attribute to him.

¶ 9    Although he was no longer dating defendant at the time of the trial, Anderson had tried to maintain contact; since this incident, he had continued to call defendant "every once in a while to see how she is doing." Defendant did not always take his calls. About two weeks before the trial, Anderson went to defendant's house drunk. He broke a window—by accident, he claimed—and climbed inside. Defendant asked him to leave, and when he did not, a physical altercation ensued that "may have" resulted in him injuring defendant's wrist.

¶ 10    Anderson also acknowledged that he spoke to defendant in court on the day of the trial. Defendant apologized, asked how he was doing, and gave him a backrub. Anderson did not "think it's necessary" to prosecute this case against defendant.

¶ 11    Stokes testified that she used to date Anderson. After they broke up, he continued to call her and frequently came to her house uninvited. They would occasionally speak on the phone "as friends." And they did so on the evening in question.

¶ 12    During the call, Stokes heard a woman in the background yelling, "Who the f**k are you talking to?" Stokes suggested that they end the call, as it did not "sound like a good situation [was] happening," but Anderson said that he needed to talk to her for a minute. Stokes soon

heard "a loud noise" that she did not know how to describe. On cross-examination, she testified that "it kind of sounded like some kind of a struggle was going on," adding that she was "not familiar with guns or anything."

¶ 13   Anderson then exclaimed, "Oh my god, the bitch shot me." The trial court allowed this testimony over defense objection, finding that it reported an excited utterance and was thus admissible as a hearsay exception. Stokes did not believe Anderson at first, but he insisted that he was serious. Stokes told Anderson that she was going to hang up, and if she did not hear back from him, she would call the police. Anderson later called Stokes and said that he had contacted the police himself.

¶ 14   Sergeant Carroll of the Chicago Police Department testified that he responded to a call of shots fired at defendant's house with his partner, Officer Montesdeoca. Defendant greeted the officers at the door, where Sergeant Carroll "inquired about there being shots fired." Defendant answered that she was trying to get Anderson to leave. The officers went inside and spoke to Anderson and defendant separately. Sergeant Carroll got the impression that both of them had been drinking.

¶ 15   Anderson told Sergeant Carroll that he and defendant got into a verbal "altercation," at least in part because he called Stokes from defendant's house. At the time, Anderson said, he was sitting at an end table in the kitchen. Defendant brandished a gun and said, "I got my card. I'll kill you." She fired one round in his direction, and at first, Anderson thought he had been shot. Defendant then walked over to Anderson and hit him in the chin with her gun. When Anderson tried to call 911, defendant warned him, "You're not calling 911. You better not think about it." Defendant held Anderson at gunpoint for about 30 minutes, after which he called the police.

¶ 16    Sergeant Carroll saw a shell casing on the kitchen floor and a suspected bullet hole in the wall "a couple feet" from the spot where Anderson said he was sitting when the shot was fired. Sergeant Carroll also saw a "dug out mark" on a nearby knee wall, indicating that the bullet may have hit the knee wall and dragged across it. A crime-scene photo showed various items "strewn about the floor," but Sergeant Carroll said the house was not in "disarray," and he did not have the impression that there had been a "struggle or anything like that."

¶ 17    Sergeant Zelitzyk testified that he spoke to defendant at her house and again at the police station. When he asked defendant what happened, she said, "Nobody fu**s with me in my own home. My daughter fu**ed with me two weeks ago and I had to put her in her place too." She also said that defendant did not attack her.

¶ 18    The defense did not have any questions for Sergeant Zelitzyk on cross-examination, but the trial court did make its own inquiry. In response to the court's questions, Sergeant Zelitzyk testified that defendant admitted "that she had fired at [Anderson]," and that her tone was "defiant" and "not apologetic."

¶ 19    The parties stipulated that Officer Montesdeoca recovered defendant's handgun from her purse. It was loaded with nine rounds. Ballistics testing established that the cartridge found in the kitchen was fired from this gun.

¶ 20    Defendant's daughter, April Baar, testified for the defense. April lived with defendant when this incident occurred. Anderson frequently showed up at the house "belligerently drunk." Beer in hand, he would stumble through the house, knocking things over, throwing things, and screaming at defendant. And he was physically aggressive. More than once, April saw him throw defendant to the floor, hold her down, and hit her. April had since moved out, but she continued to notice "marks" and "bruises" on her mother.

¶ 21    April testified to a specific incident of this kind in November 2016, about a year after the events at issue. Anderson came to the house and started "putting his hands on [defendant] once again." April called the police, who escorted Anderson out of the house. Anderson returned later that night, screamed at April, and threatened to punch her in the face. April called the police again, but Anderson was not arrested.

¶ 22    The parties stipulated that in January 2017, defendant and Dean Grass went to the police station to file a report. They were "obviously intoxicated." They told the reporting officer that Anderson came to defendant's house, broke a window on the front door, and came inside. During the "verbal altercation" that ensued, Anderson slapped Grass. When the officer asked defendant why she did not call the police, defendant became "verbally abusive." Defendant also showed the officer an abrasion and claimed that Anderson had caused it, but she did not say how.

¶ 23    Lastly, the parties stipulated that defendant had a valid FOID card and concealed-carry license.

¶ 24    In closing argument, the defense presented alternative theories of reasonable doubt and justification. First, counsel argued that the State did not prove beyond a reasonable doubt that it was defendant who fired the gunshot, or even that a gunshot was fired at all during the events in question. In this context, counsel emphasized that Anderson's prior inconsistent statements to the police were admissible to impeach him, but they were not admissible as substantive evidence and therefore could not be used to prove that defendant committed any crime.

¶ 25    Second, counsel argued in the alternative that defendant was justified in firing a gunshot during her argument with Anderson. Stokes's testimony and the crime-scene photo showing the house in some disarray established that a physical struggle preceded the gunshot. Anderson was drunk, and he had a history of drunken violence against defendant, not to mention a history of

uninvited visits to the homes of women he was dating or had once dated. Under the so-called castle doctrine, counsel argued, defendant would have been justified in using deadly force, to defend herself from Anderson's acts of violence against her in her own home. And if she was justified in using deadly force against Anderson, she was equally, if not more, justified in firing a warning shot intended to scare him out of the house, rather than to kill or injure him.

¶ 26     Among other arguments in rebuttal, the State responded that although Anderson had a history of drunken violence against defendant, there was no evidence that he hit or threatened her on that particular occasion; indeed, defendant herself told Sergeant Zelitzyk that he did not.

¶ 27     In its findings, the trial court found that the officers, Stokes, and April were all credible witnesses. In particular, the trial court credited April's testimony that Anderson was chronically drunk and often violent toward defendant. This "history of volatility" between Anderson and defendant no doubt led to "bad feelings," and those feelings were "exacerbated" when Anderson displayed the "bad judgment of calling another woman" from defendant's kitchen.

¶ 28     With those factual and credibility determinations in place, the trial court found defendant not guilty of each charged offense, explaining those findings as follows. As to attempt murder, the State failed to prove specific intent: The evidence did not show beyond a reasonable doubt that defendant was "trying to kill [Anderson] that day."

¶ 29     The charge of aggravated battery was based on the allegation that defendant pistol-whipped Anderson in the chin. But Anderson denied that defendant hit him with her gun and testified that he likely injured his chin at work. The trial court was "not sure" it believed him on that point, but there was "no other evidence other than what he initially told the police about how that injury happened." The trial court thus found the evidence insufficient to prove the charge.

¶ 30      As to aggravated discharge, the trial court found that defendant did fire a gunshot, but

the court was "not sure she was necessarily firing at him so much than to get his attention." For that reason, defendant did not commit an aggravated discharge; rather, she committed the "lesser included offense" of reckless discharge of a firearm. The trial court found her guilty of that lesser offense only, and sentenced her to 18 months' probation, which she has completed satisfactorily.

¶ 31                                    ANALYSIS

¶ 32    Defendant's lead argument is that that State failed to prove the elements of reckless discharge of a firearm beyond a reasonable doubt. But she also argues that reckless discharge was not a lesser-included offense of any crime(s) charged in the indictment. This second challenge raises a threshold question of whether the trier of fact was entitled to consider the uncharged offense in the first place, regardless of whether the evidence was sufficient to prove it. Thus, clarity is best served by taking these issues in reverse order.

¶ 33                          I. Lesser-Included Offense

¶ 34    We begin with the question whether reckless discharge of a firearm was a lesser-included offense of any charged crime, a question of law we review *de novo*. *People v. Kolton*, 219 Ill. 2d 353, 359 (2006). Defendant acknowledges that she forfeited this issue in the trial court, but we may review it under the second prong of the plain-error rule. *People v. Clark*, 2016 IL 118845, ¶¶ 41-47.

¶ 35    Because a defendant has a fundamental due-process right to notice of criminal charges, she generally may not be convicted of any crime that the State has not expressly charged her with committing. *Id.* ¶ 30. But a defendant may be convicted of an uncharged crime if it is a lesser-included offense of a charged crime, and the evidence at trial rationally supports a conviction on the lesser-included offense and an acquittal on the greater offense. *Id.* A judge presiding over a bench trial may *sua sponte* find a defendant guilty of an uncharged, lesser-

included offense. *People v. Walton*, 378 Ill. App. 3d 580, 588 (2007).

¶ 36    To determine whether an uncharged crime is a lesser-included offense, Illinois courts use the "charging instrument" approach. *Clark*, 2016 IL 118845, ¶ 31. This "case-by-case" approach looks to the "factual description of the charged offense in the indictment." *Id.* We ask whether those factual allegations set forth a "broad foundation" or "main outline" of the lesser offense. *Id*. The indictment need not explicitly state every element of the lesser offense, so long as any missing elements "can be reasonably inferred from the allegations included." *Id.*

¶ 37    "A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2014). "The discharge of a firearm is reckless when the act creates a substantial and unjustifiable risk to others." *People v. Giraud*, 2012 IL 113116, ¶ 21; see 720 ILCS 5/4-6 (West 2014) (A person is reckless when she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense ***."). The "risk" described by the statute—that of endangering someone's bodily safety—is present when the discharge "created a dangerous situation—such that an individual was in peril of probable harm or loss," but actual harm is not required. *People v. Collins*, 214 Ill. 2d 206, 215 (2005).

¶ 38    In short, the question here is whether the indictment sets forth the "main outline" of the following criminal conduct: That defendant put Anderson in danger of probable bodily harm by firing a gun.

¶ 39    Among other crimes, the indictment charged defendant with aggravated discharge of a firearm. 720 ILCS 5/24-1.2 (West 2014). Pursuant to subsection (a)(2) of that statute, the State alleged that defendant "knowingly discharged a firearm in the direction of another person, to wit: Mark Anderson." See *id.* § 5/24-1.2(a)(2). So the indictment expressly alleged the discharge of a

firearm. It did not expressly allege that the discharge was reckless, in that it put Anderson in danger of probable bodily harm. But "the act of discharging a pistol in the direction of an individual is a reckless act that would, if nothing else, endanger the safety of an individual." *People v. Williams*, 293 Ill. App. 3d 276, 281 (1997).

¶ 40     We thus held in *Williams* that reckless conduct was a lesser-included offense of aggravated discharge. *Id.* The element of endangerment—required by reckless conduct and reckless discharge alike—was reasonably inferred from the allegation of a gunshot fired in the direction of another person. The only difference between the charged and uncharged offenses was the mental state—the more culpable mental state of knowledge, as required for aggravated discharge, was replaced by the less culpable mental state of recklessness, as required for reckless conduct. *Id.*; see 720 ILCS 5/2-9 (West 2014) ("included offense" is one "established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged"). The indictment thus described the broad foundation of reckless conduct. *Williams*, 293 Ill. App. 3d at 281; see also *People v. Lane*, 2017 IL App (1st) 151988, ¶ 15 (where only difference was less culpable mental state, reckless conduct was lesser-included offense of domestic battery).

¶ 41     So too here. The factual allegations underlying the aggravated-discharge count against defendant are identical to those in *Williams*, and the only difference is whether the discharge was knowing or reckless. For the same reasons that reckless *conduct* was a lesser-included offense of aggravated discharge in *Williams*, reckless *discharge* is a lesser-included offense of that charged crime here.

¶ 42     Defendant says nothing to the contrary. Her argument, in sum, is this: The indictment alleged that she "acted with the intent to kill or injure Anderson." But the evidence showed that

she was *not* trying to kill or injure Anderson; she was merely trying to "stop[ ] a dangerous situation from escalating" by firing "a single warning shot." Thus, she concludes, the mental state charged in the indictment "cannot be reduced to recklessness," nor can recklessness be found from the evidence, because recklessness (like intent) implies "that [her] conduct was directed at harming Anderson."

¶ 43     This line of argument misses the mark for several reasons. For one thing, defendant is conflating the question of whether the indictment gave her sufficient notice of charges—the operative question here—with what the evidence ultimately established. See *Clark*, 2016 IL 118845, ¶¶ 30-31.

¶ 44     And we disagree with her premise, in any event. Recklessness does *not* imply that defendant intended to kill or harm Anderson; it implies that she ignored the risk that such harm could result from her conduct. And *that* state of mind can be reasonably inferred from the allegation in the indictment that she fired a gun in Anderson's direction. *Williams*, 293 Ill. App. 3d at 281.

¶ 45     Third, while the attempt-murder count did, of course, allege that defendant intended to kill or harm Anderson, the aggravated-discharge count did not. (Intent to kill or harm is not an element of that offense. See 720 ILCS 5/24-1.2(a)(2) (West 2016).) We say this to highlight the point that defendant's arguments, at best, might (partially) address the question whether reckless discharge was a lesser-included offense of *attempt murder*. But her arguments entirely fail to address the question whether reckless discharge was a lesser-included offense of *aggravated discharge*. Thus, on plain-error review, she has forfeited any argument that it was not. And even if it did, for the reasons we have just explained, her argument would lose on the merits.

¶ 46     In sum, reckless discharge was a lesser-included offense of aggravated discharge. The

trial court did not err, much less plainly err, in considering that uncharged offense.

¶ 47    That leaves the question of whether the evidence "rationally supports a conviction on the lesser-included offense." *Clark*, 2016 IL 118845, ¶ 30. Which is just another way of saying that we must consider the sufficiency of the evidence as to reckless discharge, an issue that defendant raises as a freestanding argument, in any event. We now turn to that question.

¶ 48                                    II. Sufficiency of Evidence

¶ 49     In reviewing the sufficiency of the evidence, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 50    On questions of witness credibility and the reasonable inferences to be drawn from the evidence, the trier of fact's findings are entitled to great deference but are not conclusive. *Ross*, 229 Ill. 2d at 272. Whether a defendant acted recklessly is a factual question, and thus the trier of fact's determination should not be overturned unless it is inherently unreasonable. *People v. Cunningham*, 2019 IL App (1st) 160709, ¶¶ 28, 30.

¶ 51    Defendant argues that the evidence was insufficient to prove reckless discharge beyond a reasonable doubt. As we have noted, to prove that defendant committed reckless discharge of a firearm, the State had to prove that she discharged a firearm, and that the discharge was reckless, meaning that she disregarded a substantial and unjustifiable risk that it would cause Anderson bodily injury. 720 ILCS 5/4-6, 5/24-1.5(a); *Giraud*, 2012 IL 113116, ¶ 21; *Collins*, 214 Ill. 2d at 215.

¶ 52    Defendant does not dispute the trial court's finding that she discharged a firearm. Indeed, she concedes that she did and argues justification for doing so. Her concession aside, the

evidence was sufficient to prove the discharge element. Stokes, whom the trial court found credible, testified that she heard "a loud noise" while she was on the phone with Anderson, followed immediately by Anderson's statement, "Oh my god, the bitch shot me," which the trial court admitted as an excited utterance. When the police arrived, Sergeant Carroll asked defendant "about there being shots fired," to which she responded that she was trying to get Anderson to leave her house. In defendant's kitchen, Sergeant Carroll found what appeared to be a bullet hole in the wall and a spent cartridge on the floor. Ballistics testing confirmed that it had been fired from defendant's gun. Even without considering Sergeant Zelitzyk's testimony that defendant admitted "that she had fired at [Anderson]"—testimony that defendant claims was erroneously elicited by the trial court's *sua sponte* inquiry—the trial court had ample evidence on which to base its finding that defendant discharged a firearm during her argument with Anderson.

¶ 53    The real dispute is whether defendant acted recklessly. To begin, the trial court found insufficient evidence that she fired in Anderson's direction. Anderson's testimony on this topic was at best muddled. Although he claimed not to recall seeing defendant with a gun, he did at least vaguely recall hearing a gunshot, and he did "believe" one was fired—but not "directly toward [him]." The trial court did not find Anderson entirely credible, but still, the only evidence that placed him relative to the bullet's trajectory came from Sergeant Carroll, who testified that Anderson said he was sitting on an end-table, a couple of feet away from the apparent bullet hole, when the shot was fired. But as defendant says, Anderson's prior inconsistent statements to Sergeant Carroll were admissible for impeachment purposes, not as a hearsay exception. And the trial court did not appear to treat them as substantive evidence. As a result, the State was unable

to prove beyond a reasonable doubt that Anderson was in the line of fire, and the trial court thus found defendant not guilty of aggravated discharge.

¶ 54    So that is our starting point: The evidence did not prove beyond a reasonable doubt that defendant fired a gun in Anderson's direction. But unlike aggravated discharge, the offense of reckless discharge does not require that finding. *Collins*, 214 Ill. 2d at 215. Rather, a discharge is reckless if it "create[s] a dangerous situation—such that an individual was in peril of probable harm or loss." *Id.*; *Giraud*, 2012 IL 113116, ¶ 23 ("If the surrounding circumstances are such that one or more other persons are endangered by the act [of discharge], the act is reckless."); *People v. Kasp*, 352 Ill. App. 3d 180, 188 (2004). Firing a gun in someone's direction is enough—more than enough—to create a substantial risk of bodily harm. And in many circumstances, firing a gun while others are "in the vicinity," but not directly in the line of fire, is enough, too. *Collins*, 214 Ill. 2d at 218.

¶ 55    To resolve the defendant's sufficiency challenge to his reckless-discharge conviction, the supreme court in *Collins* focused its inquiry on whether the record showed "that an individual was in the vicinity of the discharge." *Id.* The answer was yes: When the defendant fired gunshots into the air in his backyard, other people were in his yard, about 25-30 feet away, with still others inside his house; and the house was in a residential area, with at least 4 other houses "in proximity to" the shooting. *Id.* at 218. A reasonable jury could conclude that the people in all of these locations were "placed in danger" by the gunshots. *Id.*

¶ 56    The reason for that conclusion, as the supreme court explained, was the "inherent danger" that someone nearby might be injured by a falling bullet or a "ricochet." *Id.*; see also *People v. Peel*, 2018 IL App (4th) 160100, ¶¶ 23-25 (where defendant claimed to shoot at angle toward ground in residential area, shots could have ricocheted toward neighboring houses and so were

reckless); *People v. Banks*, 192 Ill. App. 3d 986, 996 (1989) (medical testimony supported theory that decedent killed by ricocheting bullets fired at ground). Bullets end up in unintended places for all sorts of reasons—poor aim, ricochet, the unanticipated movements of unintended victims, to name but a few. And these risks mount, becoming substantial indeed, when the bullets are fired in close proximity to other people.

¶ 57    These risks were present in spades here. Although the record does not establish *exactly* where Anderson was sitting or standing when the shot was fired, a reasonable trier of fact could find that Anderson and defendant were both in the kitchen. For all of his ostensible memory lapses, Anderson did testify the "altercation" (whatever it amounted to) took place in the kitchen, while he was on the phone with Stokes. Stokes's testimony established that the shot was fired during that call. So even if Anderson was not directly in the line of fire, he was in the room. And a trier fact could properly find, beyond a reasonable doubt, that firing a gun in the close confines of a kitchen (or other room in a house) would endanger the bodily safety of other people who were in the room at the time.

¶ 58    While defendant would paint her "warning shot" as an act not only of laudable restraint but also one of surgical precision, planned and executed to avoid bodily harm to Anderson, the possibility of injuring him with a ricochet or an otherwise errant bullet loomed large in these circumstances. Look no further than Sergeant Carroll's testimony that the bullet appeared to have careened off of the knee wall before reaching its final destination. It does not matter whether defendant fired at the knee wall and the deflection was unintended, or she fired at the wall where the bullet ultimately landed but unintentionally hit the knee wall first. Either way, these facts exemplify precisely the kind of risk that the reckless-discharge statute prohibits: The risk of an errant bullet potentially jeopardizing another person's bodily safety, even when no such harm

was intended by the shooter (and no such harm came to pass). The evidence was thus sufficient to prove the offense of reckless discharge of a firearm beyond a reasonable doubt.

¶ 59   Defendant offers various reasons why, she says, she was not reckless in firing her gun. In her reply brief, for example, she notes, accurately enough, that "[t]here was no evidence that the weapon discharged accidentally." But "[r]isk," not accident, "is the essence of recklessness." *Giraud*, 2012 IL 113116, ¶ 21; *People v. Olivieri*, 2016 IL App (1st) 152137, ¶ 28 )("[a]n accident is not to be equated with recklessness"). And there was no evidence that the defendant in *Collins*, 214 Ill. 2d at 210-11, fired his gun accidentally, either, yet the supreme court affirmed his conviction for reckless discharge. Here, too, the gunshots were no accident, as defendant says, but that is beside the point.

¶ 60   Defendant also asserts that her conduct—at worst—was negligent rather than reckless. To sustain this point, she must show that she did not *disregard* a substantial and unjustifiable risk of bodily harm to Anderson (as required for recklessness), but rather that she merely "fail[ed] to be aware" that her conduct was creating this risk (as required for negligence). 720 ILCS 5/4-7 (West 2014). To this end, defendant appears to suggest that firing a "warning shot" cannot be deemed reckless, as opposed to negligent. But she offers little or no substantive argument to support this claim. The mere fact that a bullet was intended as a "warning shot" shows nothing about the shooter's awareness of, or disregard for, the risks it may have created. There is no reason in principle why a reasonable trier of fact could not find a warning shot to be reckless. See, *e.g.*, *People v. Upton*, 230 Ill. App. 3d 365, 375-76 (1992) (among other conduct, "warning shot *** fired upward" supported finding of recklessness and thus jury instruction on reckless conduct); *Williams*, 293 Ill. App. 3d at 282 (same, where defendant fired in air to "scare the victim away").

¶ 61   Defendant's citation, *People v. Post*, 39 Ill. 2d 101 (1968), does not hold otherwise. In

*Post*, the defendant fired a pistol toward the ground, with the intention of frightening an intruder who had fled from the property and was driving away. *Id.* at 102-04. The distance between the two was unclear, but the record did establish that when the defendant fired the shot, his view of the street was limited to a 5-6-foot span by a neighboring house and garage. *Id.* at 103. As the car passed through that narrow window of visibility, the defendant fired straight down, directly at the ground, hoping to deter the intruder from returning. *Id.* at 103-05. But the bullet apparently ricocheted, striking and killing the intruder as he drove away. See *id.* The defendant was convicted of involuntary manslaughter, and the supreme court reversed.

¶ 62    The court stated that "[t]he shooting of a .22 caliber pistol toward the ground is not per se reckless and is not such an act as would likely cause death or bodily harm to a person some distance away." *Id.* at 105. More broadly, "[f]iring into the ground or into the air to frighten a marauder" away is not "such a reckless act as to justify conviction of involuntary manslaughter." *Id.* In these particular circumstances, the defendant "could not reasonably foresee that his act was likely to result in serious injury or death." *Id.* at 106. And while his conduct "was not necessarily the exercise of best judgment," his effort to protect his family "by firing a shot from a target pistol to frighten and discourage the return of a prowler [was] understandable." *Id.*

¶ 63    There seem to be two aspects to the supreme court's disposition in *Post*. First, given the circumstances, this was a highly improbable outcome of the defendant's conduct. Unlike in *Peel*, 2018 IL App (4th) 160100, ¶¶ 23-25, for example, where a ricochet was predictable because the shots (at least according to the defendant) were fired at an acute angle toward the ground, in *Post*, the shots (according to the uncontradicted testimony) were fired straight down, directly at the ground—yet they still managed to hit the driver of a moving car, at "some distance," as the car passed through a narrow window of visibility for the shooter (and thus a narrow path for the

bullet). Perhaps that outcome was too remote to conclude, beyond a reasonable doubt, that the defendant had consciously ignored a significant risk that it might come about. See *Post*, 39 Ill. 2d at 105-06. But this fact-specific holding offers no real support for defendant's argument here. Although defendant did not injure Anderson, as she is keen to emphasize, the risk of her doing so was by no means *remote* when the gun was fired in the close confines of a kitchen. A reasonable trier of fact could conclude that she was aware of that risk and ignored it.

¶ 64    Second, the court's statement in *Post* that the defendant's conduct was "understandable," if not exactly the "best judgment," might be taken to mean that he had a *justification* for firing his gun, namely, to protect his family from the possible return of the intruder. *Id.* at 106. And that brings us to defendant's principal argument: That she was justified in firing a "warning shot" to scare Anderson out of her house before she became the victim of his drunken violence again.

¶ 65    The logic of defendant's position is this: Because she was justified in using deadly force against Anderson, as a matter of self-defense, she was justified in firing a warning shot, intended *not* to kill or injure him, but merely to scare him away. That argument is not entirely without merit. A contrary holding could perversely punish the victims of violence for using less, rather than more, force to repel their attackers. On the other hand, the principle would likely need to be qualified; it is not at all obvious that a "warning shot" will be justified as an act of self-defense (or defense of another, or of the home) if it needlessly—and heedlessly—endangers someone other than the aggressor. (We don't mean to imply that happened here.)

¶ 66    But we need not explore the complications and subtleties of the principle defendant proposes, beyond noting that the matter is not such a simple and straightforward one. For our purposes here, we may assume without deciding that, on the facts of this case, self-defense was a valid defense to reckless discharge of a firearm. The problem for defendant is that the trial court

did not find, explicitly or implicitly, that she acted in justified self-defense. And the evidence did not compel the trial court to so find.

¶ 67    Justification was not the basis for any of the trial court's findings of not guilty. In the trial court's view, defendant was not guilty of attempt murder because the State failed to prove that she had the specific intent to kill Anderson, not because she was justified in trying to kill him. She was not guilty of aggravated battery because there was no evidence (at least none that was admissible for substantive purposes) establishing that defendant hit Anderson with a gun or rebutting Anderson's testimony that he probably injured himself while drunk on the job. And as we have already explained, defendant was not guilty of aggravated discharge because there was no evidence (at least none that was admissible for substantive purposes) establishing that Anderson was in the line of fire. The State thus failed to carry its burden, for one reason or another, on each of the three charged offenses.

¶ 68    As defendant notes, the trial court did credit April's testimony that, in sum, defendant had a track record of drunken physical aggression toward defendant. We have been given no reason to question, much less disturb, that credibility finding. But the trial court did not take the further step—the step that defendant's argument requires—of finding that she acted in justified self-defense on this particular occasion.

¶ 69    In fact, the trial court had a very different view of the matter: Defendant and Anderson had a volatile relationship, due in no small part to Anderson's drunken and sometimes abusive behavior. And defendant's "bad feelings" toward Anderson were no doubt "exacerbated" by his conduct in the moments leading up to shooting. But not because he attacked her or threatened to attack her physically. Rather, he displayed the "bad judgment" of "calling another woman" from her kitchen. Defendant wasn't having it; she wanted Anderson out of her house; and she fired her

gun, "in anger [and] in the heat of the moment," as the trial court put it, to "get his attention."

¶ 70    The trial court clearly did not believe that Anderson was the aggressor in this scenario. To the contrary, the trial court thought that defendant, not Anderson, escalated the conflict beyond angry words and initiated the use of force on this particular occasion. And that finding scotches defendant's claim of self-defense. *People v. Jeffries*, 164 Ill. 2d 104, 128-29 (1995).

¶ 71    Defendant argues that the ordinary strictures of self-defense were broadened in this case, because she was in her home, where the so-called castle doctrine applies. That doctrine is idle here. It is true, as defendant says, that the castle doctrine permits her to use deadly force when she reasonably believes it is "necessary to prevent the commission of [any] felony in [her] dwelling." 720 ILCS 5/7-2(a) (West 2014). But she never even suggests that Anderson was on the brink of committing any felony *except* some sort of physical violence against her. And there is no evidence that he was. So the claim remains one of self-defense, not defense of the home.

¶ 72    And it is true, as defendant says, that Illinois law does not impose a duty to retreat inside the home, but that is because Illinois law does not impose on a non-aggressor any duty to retreat at all, no matter where she is. *In re T.W.*, 381 Ill. App. 3d 603, 613 (2008); *People v. White*, 265 Ill. App. 3d 642, 651 (1994) (this "has long been the law in Illinois"); IPI Criminal 4th No. 24-25.09X ("A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor.").

¶ 73    With or without the castle doctrine, defendant's actions were not justified if they were not responsive to an imminent threat posed by Anderson. The defense argued that they were, but the trial court rejected the claim. That factual finding was not unreasonable. Defendant's claim of justification depends on the premise that a physical struggle, precipitated by Anderson, preceded the gunshot. But the evidence did not establish that.

¶ 74    For one thing, defendant admitted to Sergeant Zelitzyk that Anderdson did not attack her. The trial court found the officers, including Sergeant Zelitzyk, credible, and we have been given no basis for disturbing that finding.

¶ 75    Apart from the *Lynch* evidence detailing Anderson's conduct on other occasions (see *People v. Lynch*, 104 Ill. 2d 194 (1984)), defendant relies on two pieces of evidence to support her claim that the "altercation" had taken a physical turn by the time she fired her gun. First, she says, the crime-scene photos support that premise. Viewing the photos, Sergeant Carroll agreed that they depict some items "strewn about the floor." But Sergeant Carroll explicitly testified that the house was *not* in "disarray," and he did not have the impression, when he was at the scene, that there had been a "struggle or anything like that."

¶ 76    We do not get that impression from the photos, either. They show a few dirty dishes in the sink and on the counter; a few pieces of bric-a-brac on the floor, mostly in the corner by the door, underneath the coat rack, suggesting a deliberate pile; and some items on a coffee table, which are not obviously out of place at all. That's it. There is no toppled furniture, no broken lamps, no damage or disorder of any kind that would indicate a physical struggle had taken place there. At most, the house is a bit messy—and only a little bit messy at that.

¶ 77    Second, there was Stokes's testimony that she heard "kind of a loud noise" while she was on the phone with Anderson. On direct examination, Stokes said that she did not know how to describe the noise. Pressed on cross-examination, she said "it kind of sounded like some kind of a struggle was going on." Defendant seizes on this testimony—and makes too much of it. Stokes quickly qualified her testimony, adding that she was "not familiar with guns or anything." Right after this "loud noise," Anderson blurted out, "Oh my god, the bitch shot me," testimony that the trial court allowed, over objection, as an excited utterance. A reasonable trier of fact could thus

find that the "loud noise" was in fact the gunshot, not a *physical* struggle between defendant and Anderson—while Anderson kept talking on the phone, mind you—and that the "altercation" between them, which Stokes overheard in part, was at this point still purely verbal. What's more, Stokes testified that a woman was yelling, "Who the f**k are you talking to?" That squarely supports the trial court's view of matters, that defendant fired her gun because she was angry with Anderson for "calling another woman" from her house.

¶ 78    Given all of this evidence, the trial court could reasonably reject defendant's claims that Anderson initiated a physical altercation, and that firing her gun was a restrained and measured act of self-defense, calculated to fend off an act of imminent violence by scaring, rather than killing or injuring, Anderson.

¶ 79    In upholding the trial court's judgment, we do not make light of the physically abusive behavior that Anderson has inflicted on defendant. Nor do we disparage the difficult predicament that such abusive behavior can create for an intimate partner. Still, the evidence did not establish that defendant fired her gun in response to a threat of imminent harm. The trial court thus reasonably rejected her claim of justification. The evidence was sufficient to prove defendant guilty of reckless discharge of a firearm.

¶ 80                         III. Ineffective Assistance of Counsel

¶ 81    Lastly, defendant argues that counsel was ineffective for failing to object to the admission of Anderson's prior statements to the police, and to the trial court's *sua sponte* questioning of Sergeant Zelitzyk. We review this claim under the familiar deficiency-and-prejudice framework of *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Fillyaw*, 409 Ill. App. 3d 302, 315 (2011) (counsel may be deemed ineffective for failing to "use the applicable rules of evidence" to defendant's advantage).

¶ 82    We begin with defendant's claim that counsel should have objected to the admission of Anderson's prior inconsistent statements to the police. On the stand, Anderson claimed to have little or no recollection of the events at issue. The State later elicited testimony from Sergeant Carroll, one of the responding officers, that Anderson made the following statements to him at the scene: Defendant said, "I got my card. I'll kill you," and then fired one round in his direction, while he was sitting at an end table in the kitchen, a couple of feet from the apparent bullet hole in the wall. Defendant then hit Anderson in the chin with her gun. And when he tried to call 911, defendant threatened him and held him at gunpoint for upwards of half an hour.

¶ 83    Defendant does not dispute that these prior inconsistent statements were admissible to impeach Anderson. See 725 ILCS 5/115-10.1 (West 2014). Rather, he purports to object to their "substantive admission," that is, their admission as substantive, rather than merely impeachment, evidence. But as defendant acknowledges several times in her brief, "Judge Linn apparently did not treat this testimony as substantive evidence of guilt."

¶ 84    Indeed he did not. The trial court found insufficient evidence of defendant's alleged intent to kill Anderson, as required by the attempt-murder count, despite Anderson's statement that defendant said, "I'll kill you" right before firing her gun. The trial court found insufficient evidence that defendant fired the shot in Anderson's direction, as required by the aggravated-discharge count, despite Anderson's statement that he was sitting at the end-table, within arm's reach of the apparent bullet hole, when the shot was fired. And the trial court found insufficient evidence that defendant hit Anderson in the chin with her gun, as required by the aggravated-battery count, despite Anderson's statement that she did. The trial court was perfectly clear that where "there is no other evidence other than what he initially told the police about how that injury [to his chin] happened," the evidence was insufficient to prove the State's allegation. And

the finding of guilty on the reckless-discharge count, as our analysis has shown, did not depend on using any of this impeachment evidence for substantive purposes. As defendant concedes, the trial court did not make that error.

¶ 85     So what possible basis can there be for an ineffective-assistance claim? One problem is that defendant cannot show that she was prejudiced by any alleged failure on counsel's part. But an even more basic problem is that counsel was not deficient at all. Counsel had no basis, at any time, for objecting to anything that the trial court did. Counsel could not object when Anderson's prior inconsistent statements were elicited from Sergeant Carroll, because those statements, by defendant's own admission, were proper impeachment evidence. And counsel—to belabor the obvious for a moment—had no basis to object when the trial court, again by defendant's own admission, did *not* use this evidence for any improper purpose in its findings.

¶ 86     Instead, defendant says that counsel should have objected just in case *this* court were to conclude that the impeachment evidence is "compelling, substantive evidence of guilt." In other words, counsel should have objected, despite the absence of any error, just in case the appellate court, on its own initiative, were to use evidence for purposes for which it was not admitted or used in the trial court. We have made no such improper use of the evidence, but in any event, this is not a coherent basis for an objection in the trial court. Counsel was not deficient.

¶ 87     Second, defendant argues that counsel should have objected to the trial court's *sua sponte* questioning of Sergeant Zelitzyk. Specifically, the trial court posed two questions: "What was it you asked her before she made a statement to you?" and "You ask her anything about shooting a gun?" In response to these questions, Sergeant Zelitzyk testified that defendant admitted "that she had fired at [Anderson]," and that her tone was "defiant" and "not apologetic."

¶ 88     Note that the rest of Sergeant Zelitzyk's testimony—for instance, that defendant said that

Anderson did not attack her—was elicited by the State on direct examination and thus cannot be a predicate for this claim.

¶ 89    "It is well established that a trial judge has a right to question witnesses in order to elicit the truth or to clarify issues which seem obscure," so long as the examination is "conducted in a fair and impartial manner," so that the court does not improperly assume the role of advocate for one of the parties. *People v. Williams*, 173 Ill. 2d 48, 79 (1996); *People v. Jackson*, 409 Ill. App. 3d 631, 647 (2011). The court's questioning should "rarely be extensive," unless there is reason to believe that a witness is not being truthful. *Jackson*, 409 Ill. App. 3d at 647. And the danger that such questioning will be prejudicial is "lessened" at a bench trial. *Id.*

¶ 90    Applying these principles here, we cannot say that counsel had any basis for objecting to the very short inquiry initiated by the trial court. But even if counsel was deficient in this regard (and we are not saying that she was), defendant cannot show that the testimony elicited by the trial court's inquiry was prejudicial to her defense. That much should be evident from what we have already said: The trial court found that defendant did *not* shoot "at" Anderson, and for that reason acquitted her of both attempt murder and aggravated discharge. To find defendant guilty of reckless discharge, the trial court simply needed to find that defendant fired her gun (without a justification for doing so), and that Anderson was in close-enough proximity to be put in danger of bodily harm. The trial court did not need the testimony it elicited from Sergeant Zelitzyk to make those findings, and we have no doubt that the outcome of defendant's trial would have been the same had the trial judge not made this brief inquiry of Sergeant Zelitzyk at all.

¶ 91                                    CONCLUSION

¶ 92    For these reasons, we affirm defendant's conviction and sentence.

¶ 93    Affirmed.